# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 48927

STATE OF IDAHO,

    Plaintiff-Respondent,

v.

CORY DEMETRIUS WRIGHT,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

Opinion Filed: April 10, 2023

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Cynthia Yee-Wallace, District Judge; Hon. Nancy Baskin, District Judge.

Judgment of conviction for lewd conduct with a minor under sixteen and sexual abuse of a child under sixteen years, <u>affirmed</u>.

Eric D. Fredericksen, State Appellate Public Defender; Elizabeth A. Allred, Deputy Appellate Public Defender, Boise, for appellant. Elizabeth A. Allred argued.

Hon. Raúl Labrador, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

---

HUSKEY, Judge

Corey Demetrius Wright appeals from his judgment of conviction for lewd conduct with a minor under sixteen and sexual abuse of a child under sixteen years. Wright argues the district court erred in denying his challenge to the State's exercise of a peremptory challenge under *Batson v. Kentucky*, 476 U.S. 79, 96 (1986); admitting Idaho Rule of Evidence 404(b) evidence; denying his motion for a mistrial; and denying his I.R.E. 412 motion. Wright also asserts the State committed misconduct when it failed to fully redact the CARES interview of the victim. Additionally, Wright argues even if the alleged errors are harmless, their accumulated impact amount to cumulative error. The district court did not err and even if the court did err, any error was harmless, and Wright is not entitled to relief based on cumulative error. The judgment of conviction is affirmed.

1

# I.

## FACTUAL AND PROCEDUAL BACKGROUND

The State charged Wright with three counts of lewd conduct with a minor under sixteen, Idaho Code § 18-1508, two counts of aggravated assault, I.C. §§ 18-901(b), 18-905, two counts of sexual abuse of a child under sixteen, I.C. § 18-1506, and one count of attempted lewd conduct with a minor under sixteen, I.C. §§ 18-1508, 18-306. The charges arose from alleged conduct against A.W. and A.S., Wright's daughter and his daughter's half-sister. Prior to trial, the parties filed several motions to determine the admissibility of certain evidence. The State moved to introduce evidence, pursuant to Idaho Rule of Evidence 404(b), that Wright had recently been released from a seven-year prison term. The evidence included, in part, a text message conversation between Wright and Patti Stuart, A.S.'s mother and A.W.'s guardian, after Stuart confronted Wright with allegations he abused A.S. A portion of the text message conversation included Wright's response to Stuart's statement that Wright had inappropriately touched A.S., which read, in part, "[i]t had been 7 years and I got carried away. I didn't have sex with her it's important you know that." While the State alleged it should be able to use this statement as evidence under I.R.E. 404(b), Wright maintained the reference to "7 years" in the text message implied that Wright had previously been incarcerated and, therefore, it should be excluded.

After a hearing, the State conceded the evidence could not be introduced to show Wright had been in prison, but argued it was relevant to show motive or intent. The district court found Wright's reference to "7 years" in the text message did not explicitly state or implicitly indicate that Wright had been incarcerated during this time. Consequently, the district court held the State could introduce the challenged text message during trial as well as evidence that Wright had been away from the family for seven years. However, the district court told the State it could not introduce evidence that Wright's incarceration was the reason for the absence, or add any information to, or context for, the text message. The district court also ruled that the State could not tell the jury why Wright had been away from the family for seven years or that he was in a place where he was not around women.

Wright filed a motion to exclude A.S.'s and A.W.'s forensic interviews and other medical records from St. Luke's Children at Risk Evaluation Services (CARES), including the video of the forensic interviews (CARES interviews). Wright argued the interviews were inadmissible under I.R.E. 803(4) and 803(24) and, alternatively, the admission of the interviews would violate his

2

rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. After a hearing, the district court issued a preliminary ruling regarding the admissibility of the CARES medical records, including the CARES interviews, reserving its final ruling on the matter until trial when it would know whether the victims were testifying and could consider any other additional relevant foundational evidence. The district court found portions of A.S.'s and A.W.'s CARES interviews would likely be admissible under I.R.E. 803(4) if they pertained to a medical purpose, but the portions of the interviews that did not serve a medical purpose would likely be inadmissible. Although the district court did not order the State to redact portions of the interviews, based on the previous hearing about the text messages, the State understood the need to redact any reference to Wright's incarceration or his lack of access to females.

Wright also filed a motion pursuant to I.R.E. 412 to introduce evidence at trial that A.S. allegedly made prior false allegations of sex crimes. Wright submitted police reports from a 2015 investigation (2015 allegations) in Arizona to support his claim that A.S. had previously falsely accused a family friend of inappropriate touching. Wright argued because the police reports did not indicate that any charges were filed against the family friend, Wright demonstrated that A.S.'s 2015 allegations were false and, therefore, he should be permitted to impeach A.S. about the prior allegation at trial through cross-examination. After a hearing, the district court found that Wright had not established the 2015 allegations were false and denied Wright's motion to introduce evidence related to the 2015 allegations. Wright filed a motion for reconsideration of the denial of his I.R.E. 412 motion, which the district court also denied.

The matter proceeded to trial and thirty-four potential jurors reported to serve. Each party was given approximately thirty minutes[1] for voir dire and three peremptory challenges.[2] Each party used all three of its peremptory challenges. The State used one of its peremptory challenges to strike Juror 28. Wright challenged the strike of Juror 28, arguing the State's peremptory challenge to Juror 28 was race-based and, therefore, violated the Equal Protection Clause of the

---

[1]     The district court stated that although the goal was to give each side thirty-minutes, it would extend the time if necessary.

[2]     The limitation on peremptory strikes was in accord with an Idaho Supreme Court Emergency Order regarding trial procedures during the COVID pandemic. Although Wright challenged the decision to limit each party to three peremptory strikes below, Wright does not raise the issue on appeal.

3

Fourteenth Amendment pursuant to *Batson*. The district court found the State did not execute its peremptory challenge on the basis of race and denied Wright's *Batson* challenge.

During its case-in-chief, the State introduced the text messages between Stuart and Wright. Wright reiterated his previous objection: allowing the jury to hear the phrase or read the text message about "7 years" implied that Wright had been incarcerated during that time. The district court overruled the objection, and the text messages were admitted. The State also introduced videos of A.S.'s and A.W.'s CARES interviews. After A.S.'s CARES interview was played for the jury, Wright moved for a mistrial. Wright argued the video was not properly redacted by the State as ordered by the district court because the video of the CARES interview included a statement by A.S. that Wright "was gone for seven years and he wasn't able to have sex with a girl for seven years," and the statement necessarily implied Wright had been incarcerated for seven years.

The district court agreed the statement at issue should have been redacted, but found the error did not justify a mistrial. The district court ordered the State to redact the statement from the video before the video went to the jury for deliberations. Further, the court informed the jury that a portion of the video exhibit had been redacted and reserved its decision on whether to give a limiting instruction regarding the video. After the State rested its case-in-chief, Wright again moved for a mistrial relying on his previous argument. The district court denied the motion. After both parties rested, the district court instructed the jury not to consider evidence that had been excluded, stricken, or redacted and not to speculate about why Wright was previously away from his family for a period of time.

The jury found Wright guilty of lewd conduct with a minor under sixteen for manual-to-genital contact of A.S. and sex abuse of a child under sixteen years for grabbing A.S.'s breasts and/or buttocks. The jury was unable to reach a verdict for sexual abuse of a child for conduct relating to A.W. and found Wright not guilty of all other charges. Wright timely appeals.

## II.

## ANALYSIS

Wright makes several claims on appeal, each of which is addressed below.

### A. The District Court Did Not Err in Denying Wright's *Batson* Challenge

Wright argues the district court erred in denying his *Batson* challenge because the State violated his right to equal protection when it used a peremptory challenge to strike Juror 28 from

4

the venire. Wright argues the district court's finding that the State did not strike Juror 28 with discriminatory intent is clearly erroneous because the record shows "100% of Black potential jurors were excluded; no questions were asked of the only Black juror; other jurors who were not questioned by the State were selected to serve on the jury; and the prosecutor made misrepresentations while presenting the 'race-neutral' reason for striking" Juror 28. In response, the State argues Wright's claim fails because he failed to make a prima facie case for discriminatory intent, the State offered a race-neutral reason for the peremptory strike, and the district court's finding that the strike was not made with discriminatory intent is not clearly erroneous.

A party violates the Equal Protection Clause of the Fourteenth Amendment by exercising a peremptory strike based on a prospective juror's race. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 146 (1994); *Batson*, 476 U.S. at 96. When a party asserts such a violation occurred, the trial court uses a three-part burden-shifting framework to assess whether the challenged peremptory strike was based on an impermissible discriminatory motive. *See Batson*, 476 U.S. at 93-98. First, the party asserting a violation must make a prima facie showing of two facts. The moving party "must show that he is a member of a cognizable racial group." *Id*. at 96. Cognizable racial groups "are those which have historically been subjected to discriminatory treatment and have from time-to-time required aid from the courts in securing equal treatment under the law." *State v. Foster*, 152 Idaho 88, 91, 266 P.3d 1193, 1196 (Ct. App. 2011). The moving party must then show that the prosecutor has exercised peremptory challenges to remove from the venire members of a cognizable racial group. *Powers v. Ohio*, 499 U.S. 400, 415 (1991). Second, if a prima facie case is established, the burden shifts to the opposing party to present a nondiscriminatory, race-neutral reason for striking the prospective juror. *See Batson*, 476 U.S. at 97. The focus of this second step is on the facial validity of the opposing party's explanation; it "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995); *State v. Ish*, 166 Idaho 492, 502, 461 P.3d 774, 784 (2020). Thus, unless a discriminatory intent is inherent in the explanation, the reason offered will be considered race-neutral. *Purkett*, 514 U.S. at 768; *Ish*, 166 Idaho at 502, 461 P.3d at 784. Third, if the opposing party articulates a facially valid reason for the peremptory strike, the trial court must determine whether purposeful discrimination has been established, i.e., whether the prospective juror was removed based on race. *See Hernandez v. New York*, 500 U.S. 352, 363 (1991) (plurality opinion); *Batson*, 476 U.S. at 98.

5

In this third step, the trial court considers the totality of the circumstances, including the weight of the proffered race-neutral explanation(s) in light of all the relevant facts, circumstances, and arguments presented, to determine whether the peremptory strike was substantially motivated by discriminatory intent. *Flowers v. Mississippi*, ___ U.S. ___, ___, 139 S. Ct. 2228, 2243-44 (2019); *Ish*, 166 Idaho at 503, 461 P.3d at 785. Ultimately, "[i]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Hernandez*, 500 U.S. at 365. As such, the trial court's determination of discriminatory intent largely turns on its evaluation of credibility. *Id.* at 364.

A peremptory strike is not unconstitutional solely because it results in a racially disproportionate impact; proof of racially discriminatory intent or purpose is still required. *Id.* at 359-62. Racially discriminatory intent or purpose "implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 360.

Throughout this three-step process, the ultimate burden of persuasion regarding racial motivation remains with the party asserting a violation. *Purkett*, 514 U.S. at 768. Although the determination of whether the constitutional requirements have been met is reviewed de novo, a trial court's finding of discriminatory intent under the third prong of *Batson* is a pure issue of fact and, as such, will not be overturned unless it is clearly erroneous. *Hernandez*, 500 U.S. at 364; *Ish*, 166 Idaho at 501, 461 P.3d at 783.

The State used a peremptory strike to remove Juror 28 from the venire. Wright challenged the strike, arguing that Juror 28 was "the only [B]lack juror on the entire panel" and was struck with discriminatory intent. In response, the prosecutor disagreed that Juror 28 was Black and explained the reason for the use of the peremptory strike--that he had not asked Jurors 28-34 any questions because of the statistical unlikelihood they would become part of the jury. The district court found the State offered a race-neutral reason for the peremptory strike and its proffered reason was credible. Thus, the district court denied Wright's *Batson* challenge.

### 1. Prima facie case

The first step of a *Batson* analysis requires Wright to make a prima facie showing that both he and the struck juror are each a member of a cognizable racial group and that the prosecutor exercised its peremptory challenge to remove the juror because of the juror's race. *Batson*, 476

U.S. at 96-97. For the purpose of applying the *Batson* analysis, a Black individual is a member of a cognizable racial group. *Id.*

In this case, the paucity of the record prevents this Court from determining whether Wright made a prima facie showing of racial discrimination. While there is evidence in the record that Wright is Black, the record does not contain juror demographic information, juror questionnaire responses, or other evidence about the race of the members in the venire, including Juror 28. The only information about Juror 28's race is Wright's trial counsel's assertion to the district court during the *Batson* challenge that Juror 28 was "the only [B]lack juror on the entire panel" and that there was "no other reason for [the State's] striking other than the fact that she is [B]lack, that she showed support for Black Lives Matter, and that she was offended by the 'All lives matter' question." However, unsworn oral or written representations, even those of an officer of the court, are not evidence. *See Zepeda v. State*, 152 Idaho 710, 716, 274 P.3d 11, 17 (Ct. App. 2012). Wright offered no evidence in the trial court or on appeal to support his claim that Juror 28 is Black, the prosecutor disputed that Juror 28 is Black, and the district court did not make a factual finding related to Juror 28's race or to the broader issue of whether Wright made a prima facie showing for the first step of the *Batson* analysis.

Other courts have noted the importance of a developed record for *Batson* discrimination claims. *Sorto v. Herbert*, 497 F.3d 163, 173 (2d Cir. 2007) (holding without well-crafted record, *Batson* challenge depends on labored piecing together of transcript fragments to intuit race and ethnicity of jurors and reconstruct and imagine what might have happened); *State v. Bennett*, 843 S.E.2d 222, 232 (N.C. 2020) (if there is any question as to prospective juror's race, issue should be resolved by trial court based upon questioning of juror or other proper evidence); *Asbury v. Georgia World Cong. Ctr.*, 442 S.E.2d 822, 824 (Ga. Ct. App. 1994) (holding record insufficient for appellate court to determine whether trial court erred because record did not show identity of individual panel members with any certainty). In this case, we decline to assume the most critical factual finding--the race of Juror 28--with no evidence from which to draw that conclusion. Wright failed to provide an adequate record to determine whether he met his burden of establishing a prima facie showing of racial discrimination under the first step of *Batson*.

a. **Implicit finding of prima facie case**

Wright argues the lack of explicit factual findings on the first step of *Batson* is not dispositive of his claim for two reasons. First, Wright argues the district court made an implicit

finding that Juror 28 is Black by addressing the merits of the second and third prongs of *Batson* when it denied his *Batson* challenge. Second, Wright argues that whether he met the first prong of the *Batson* challenge is moot because when the prosecutor defended its peremptory strike, the district court moved to the second and third steps of the *Batson* analysis, thereby answering the ultimate question. We will address each assertion.

Wright argues the district court implicitly found he established a prima facie case of racial discrimination. The State argues that Wright failed to establish a prima facie showing of racial discrimination because Wright failed to establish that Juror 28 is Black, failed to establish any discriminatory motive for the peremptory strike, failed to provide any authority that the district court implicitly found Juror 28 is Black, and failed to show the strike was exercised with discriminatory motive simply because the district court addressed the second and third parts of the *Batson* analysis. The State further argues that precedent precludes this Court from supplying the necessary factual predicates for the first step of Wright's *Batson* challenge.

The State's proffered race-neutral reason under the second step and the district court's finding under the second and third steps did not require the court to make the predicate factual findings for the first step of *Batson*. Instead, the second and third steps only required the district court to address whether the State offered a facially race-neutral reason for the strike and whether the district court found this reason credible. Accordingly, the district court's finding that the State was sincere in its race-neutral reason for striking Juror 28 does not necessarily require a factual determination that Juror 28 is Black. Thus, the district court did not implicitly find Juror 28 is Black or that the totality of the circumstances raises an inference that the peremptory challenge was exercised because of a discriminatory motive. Wright has failed to make a prima facie showing of racial discrimination under the first step of *Batson*.

Even if we assume the district court implicitly found Juror 28 is Black, implicit factual findings are clearly erroneous unless they are supported by substantial and competent evidence. *State v. Floyd*, 159 Idaho 370, 372, 360 P.3d 379, 381 (Ct. App. 2015) ("Implicit findings should be overturned only if not supported by substantial evidence."). Here, there is *no* evidence in the record of any potential juror's race, including Juror 28's. Wright argues that Juror 28's "strong feelings" indicated in her answer to the "Black Lives Matter" questions also provide evidence of her race, and concomitantly, evidence of the State's discriminatory intent in striking her. Juror 28's response to the Black Lives Matter questions does not make it more likely than not that Juror

8

belonged to a cognizable racial group and was peremptorily stricken from the venire for a racially discriminatory reason.

In light of the above, we reject the argument that the district court implicitly found the predicate facts to establish a prima facie case of racial discrimination or that such facts are supported by substantial and competent evidence.

### b.    Mootness of prima facie case

Wright argues that, under *Hernandez*, the determination of whether he met his burden of showing a prima facie case for racial discrimination is moot because the State offered a race-neutral reason for the strike and the district court ultimately addressed whether discriminatory intent was established in steps two and three of the *Batson* analysis.

The portion of *Hernandez* on which Wright relies explains that once the party contesting the *Batson* challenge has offered a race-neutral reason for the strike, whether the moving party properly made out a prima facie case is no longer relevant because, at this point, the trial court has all the evidence necessary to determine whether the juror strike was the result of intentional discrimination under the third prong. *Hernandez*, 500 U.S. at 359. Pursuant to *Hernandez*, once a trial court rules on the third prong of the *Batson* analysis, it has applied the more stringent burden of proof and ruled on the ultimate factual issue; therefore, whether the moving party met the preliminary, lower prima facie burden of proof is irrelevant. *Id.*; *see also United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (holding prima facie requirement was "never intended to be rigid, mechanized, or ritualistic"; "it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination").

In *Hernandez*, the defense raised a *Batson* challenge to the State's peremptory strike of four Latino jurors. *Hernandez*, 500 U.S. at 355-356. The prosecutor stated he was not certain as to the racial identity of two of the jurors and did not strike them because of their race but because he felt the two would not accept the interpreter's interpretation. *Id.* at 356. On appeal, the New York Supreme Court, Appellate Division, noted that though the ethnicity of one challenged bilingual juror remained uncertain, the prosecutor had challenged the only three prospective jurors with definite Hispanic surnames. *Id.* at 358. The New York Court of Appeals also affirmed the judgment, holding that the prosecutor had offered a legitimate basis for challenging the individuals in question and *deferring to the factual findings of the lower New York courts*. *Id.* Thus, while

9

*Hernandez* noted that a trial court could rule on the third step because it had all the information necessary to resolve the case, that conclusion rested, in part, on the factual findings of the lower court, which included some evidence of the race of the struck jurors.

We agree that *Hernandez* holds that once a court rules on the third step of the *Batson* analysis, the question of whether the moving party has established his initial, prima facie case is irrelevant for purposes of shifting the burden of proof to the State. However, we decline to hold that a court's willingness to shift the burden of proof means that all the necessary factual predicates for the claim have been established. Whether Wright met a prima facie case of intentional racial discrimination does not preclude this Court from proceeding through the *Batson* analysis but does not mean Wright established a prima facie case that Juror 28 is Black, or that the State used its peremptory strike with discriminatory intent. As such, Wright's *Batson* challenge fails because Wright failed to make a prima facie showing that Juror 28 is a member of a cognizable racial group and was struck with discriminatory intent.

Nonetheless, because the State offered an explanation for the peremptory challenge and the district court ruled on the ultimate question of intentional discrimination, this Court will address the merits of Wright's *Batson* claim. Accordingly, we turn to the second step of *Batson*; whether the State offered a race-neutral reason to support the peremptory strike.

### 2. State's race-neutral reason

Once the opponent of the *Batson* challenge offers a reason for the use of the peremptory strike, the trial "court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause." *Hernandez*, 500 U.S. at 359. At this step, the trial court looks only to the facial validity of the explanation. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id*. at 360. The disparate impact of the strike on the racial composition of the jury is not conclusive when determining whether the proffered reason for the strike is race-neutral. *Id*. at 362.

Wright argues the State did not assert a race-neutral reason for the peremptory strike. In support of this conclusion, Wright cites to *Ish* and argues the State failed to offer a race-neutral explanation that was "clear and reasonably specific" and "related to the case to be tried" or provide "legitimate reasons" for the use of the strike. Wright alleges "the State made bald allegations that they did not strike the juror with discriminatory intent and provided a pretextual reason for striking

the juror." Wright's argument on this issue mischaracterizes both the record and the legal authority cited.

First, Wright's allegation that the State's proffered explanation for the peremptory strike was a bald assertion of non-discriminatory motive fails to consider the full context of the prosecutor's response to Wright's allegation of a *Batson* violation. The State's full explanation was as follows:

> Your Honor, No. 1, she did not appear to the State as [B]lack.[3] I don't know where defense is even coming with that. As far as why I struck her, your Honor, is because I didn't talk to her row. I didn't know anything about her. The number game got a little bit away from me, and so I was able to talk to everybody else, and so that's--the reason why I struck her is because I didn't know anything about her. And your Honor, further, what makes this incredibly offensive to me is one of the victim[s is B]lack.
>
> So I want--I want an absolutely nonracist jury because I want her to be listened to and treated--and not just her, but many of the witnesses in this case are [B]lack, State witnesses. And so we absolutely did not do that, and I--I don't think she looked that [B]lack. She certainly didn't to me, and so I don't--I don't think a *Batson* challenge is appropriate anyway.

The State's explanation to the district court outlined that it used the peremptory strike in question because it: (1) did not perceive Juror 28 to be Black; (2) did not know enough about Juror 28 because, as it explained during voir dire, it did not question Jurors 28-34; (3) believed those jurors were statistically unlikely to be selected for the final jury; and (4) wanted a nonracist jury so the testimony of the victim and some witnesses, who are Black, would not be discounted because of their race.

This explanation is not a bald assertion under *Ish*. The *Ish* Court held:

> *Batson*'s second step "does not demand an explanation that is persuasive, or even plausible." The focus is on "the facial validity of the prosecutor's explanation," so "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." For instance, a juror's demeanor can supply a valid race-neutral reason. Likewise, a prosecutor's challenge based on a juror's "long, unkempt hair . . . mustache, and . . . beard" has been found to satisfy *Batson*'s second step. What a prosecutor may not do is provide overly general reasons such as "demeanor" or baldly assert that they did not exercise the challenges with discriminatory motive.

---

[3] The State's comments about Juror 28's appearance may have been a result of the fact that the jurors were all wearing masks and were seated approximately six feet apart to comply with the Idaho Supreme Court's Emergency Order regarding conducting trials during the COVID pandemic.

11

*Ish*, 166 Idaho at 502, 461 P.3d at 784 (citations omitted). Thus, even if focusing on the last sentence of the above quote, the bald assertion referenced would simply be a broad statement by the prosecutor that he did not exercise his peremptory challenge with a discriminatory motive.

Here, the prosecutor provided neither an overly general statement nor a bald assertion regarding his motive. Instead, the State's explanation was specific and related to the case to be tried. The State's reason was also race-neutral, as nothing in the explanation shows that the prosecutor chose not to ask questions of the back two rows of potential jurors during voir dire because he wanted to prevent a Black individual from serving on the jury. Accordingly, the State offered a race-neutral reason for the peremptory strike as required under the second step of *Batson*.[4] Thus, the district court's finding that the State offered a nondiscriminatory, race-neutral reason for peremptory striking Juror 28 was not clearly erroneous.

### 3. Discriminatory intent

We turn to the third step in the *Batson* analysis; whether there was purposeful discrimination in the State's use of a peremptory strike against Juror 28. The United States Supreme Court has made clear that the trial court's decision on the third step, whether there was discriminatory intent in the strike, represents a finding of fact of the sort accorded great deference on appeal:

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.

*Hernandez*, 500 U.S. at 365.

The district court found the State's explanation was credible and supported by its actions during voir dire, finding:

> I specifically took note that the State did not get to the back two rows [of the venire], which is why I inquired of [the State] to see if he wanted to follow up on that, and I think he just made a calculation that we wouldn't get to those back two rows, so I take his response as both valid and honest and not pretextual. So I will deny the motion based on *United States v. Batson*. I had observed that that occurred in court, that the State did not--purposely did not question the rows that Juror No. 28 was in

---

[4]     Wright's additional arguments concerning the legitimacy of the State's proffered justification for the strike are only relevant to the third step of the analysis--whether the district court believed the State's race-neutral reason for the strike.

because I just think the State did not anticipate they were not gonna get to them, and I certainly followed up with that. So I think that reason is both valid and not pretextual. So I will go ahead and deny the motion based on *Batson*.

The State's strategic decision to focus on potential jury members that were more statistically likely to serve on the jury was evident during the voir dire process. Thirty-four individuals attended jury selection for the selection of fourteen jurors (twelve jurors and two alternates). The potential jurors were assigned a number that represented the potential juror's seat in the final jury panel. For example, Juror 1 was seated in the first seat of the jury panel; unless struck, Juror 1 would be Juror 1 for the trial. As such, only Jurors 1-14 were originally slated to serve on the jury.

Wright and the State were each given thirty minutes to question the venire and three peremptory strikes. The district court did not limit its respective voir dire to any particular section of the venire. However, after the district court's voir dire, some of the jurors had been excused for cause. The prosecutor made a strategic decision to focus his limited voir dire time on the remaining jurors most statistically likely to be selected for the final jury, i.e., Jurors 1-27, and ignore the last two rows of potential jurors, Jurors 28-34. The State demonstrated this strategy throughout its voir dire. For example, after the State asked if any potential jury panel member had "a friend, a family member, or know someone who has been a victim of sexual abuse," the State followed up with each potential juror in numerical order, stopping before the last two rows. At that point, the State said: "All right. So I'm gonna not ask the last two rows. Spoiler: Mathematically, it's highly unlikely you'll make this jury, but it is possible, but I'm gonna pass you for now." The State did not deviate from this strategy throughout the rest of jury selection; it never engaged in any individualized questioning beyond Juror 27.

The State's calculation that no one from the last two rows of potential jurors would likely serve on the jury held true throughout much of voir dire. After the district court's voir dire, two potential jurors, Jurors 6 and Juror 29, were excused for cause; Juror 28 did not replace either of them. The State successfully challenged Juror 13 for cause; Juror 28 did not replace that juror. The district court then inquired of hardships and, as a result, excused Juror 12 and Juror 15; Juror 28 did not replace either of those jurors. The State then successfully challenged Juror 22 for cause; Juror 28 did not replace that juror. During Wright's voir dire, Wright successfully struck Juror 7 for cause; Juror 28 did not replace that juror. Wright's last challenge for cause, which successfully removed Juror 3, caused Juror 28 to be the last potential juror to be seated in the 20-person pool

13

from which peremptory strikes would be used. Thus, it was not until Wright's last challenge for cause that Juror 28 became potential Juror 14. Given the above record, we conclude that the district court's finding of no discriminatory intent in the State's use of a peremptory strike against Juror 28 was not clearly erroneous.

Despite the district court's conclusion, Wright argues the district court erred in finding the State did not have discriminatory intent in striking Juror 28 because the State's proffered reason for striking Juror 28 was pretextual in light of its lack of questioning of Juror 28 before striking her and because the "statistical evidence, evidence of disparate questioning, side-by-side comparisons, and the prosecutor's misrepresentation of the record" demonstrate discriminatory intent. We disagree.

### a. State's lack of questioning of Juror 28 does not show the proffered reasons for the strike were pretextual

Wright argues the State's proffered reason was merely pretextual because "[w]hile there is no requirement that a party must question a venire member during voir dire, jurisprudence holds that a lack of questioning before exercising a peremptory challenge is evidence that the explanation is sham and a pretext for discrimination." Wright cites to *Miller-El v. Dretke*, 545 U.S. 231, 246 (2005) (*Dretke*) and *Alex v. Rayne Concrete Serv.*, 951 So. 2d 138, 154 (La. 2005) as support for this argument, but Wright mischaracterizes the holdings in these cases and, therefore, his argument is unpersuasive.

Wright cites to *Dretke* as holding that a party's failure "to ask questions about information that would be considered important is evidence of pretext because it shows that the answers would not have mattered as the party was going to strike the juror regardless." However, this is not the holding of *Dretke*. In *Dretke*, a capital case, there were twenty Black members of the 108-person venire; of those twenty, nine were excused for cause or by agreement and ten were peremptorily stricken by the State. *Dretke*, 545 U.S. at 240-41. One of the potential Black jurors stricken by the State was Fields, who "expressed unwavering support for the death penalty" in both the juror questionnaire and in response to direct questioning during voir dire; "testified that he had no religious or philosophical reservations about the death penalty and that the death penalty deterred crime"; and twice indicated that he could sit on the jury and decide to impose the death penalty. *Id.* at 242. Although Fields made some comments about rehabilitation, he also said his belief would not inhibit his decision to impose the death penalty. *Id.* Fields stated he had a brother who

14

had been convicted of a crime, but that would not interfere with his ability to sit on the jury. *Id*. at 243.

After the State used a peremptory strike on Fields, the defendant challenged the peremptory strike as a race-based strike.[5] *Id*. at 236. The State explained it struck Fields because of concern about whether Fields could impose the death penalty because Fields said "he could only give death if he thought a person could not be rehabilitated." *Id*. The State also expressed concerns that Fields' religious beliefs might affect his jury service. *Id*. When defense counsel pointed out that the State had mischaracterized Fields' statements, the State "neither defended what he said nor withdrew the strike." *Id*. at 246. Instead, it proffered a new explanation--that Fields' brother had a prior conviction. *Id*.

The Supreme Court noted the State mischaracterized Fields' testimony and that "in light of Fields' outspoken support for the death penalty, we expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike." *Id*. at 244. The Court noted the State's latter explanation "reek[ed] of afterthought" and that given Field's comments regarding his brother (the two were not close and Fields did not know much about the conviction), the Court expected the State to engage in additional inquiry if, as it proffered, it was concerned about the conviction. *Id*. at 246. The Court specifically noted: "[T]he State's failure to engage in *any meaningful voir dire examination on a subject the State alleges it is concerned about* is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Id*. (emphasis added). Thus, *Dretke* does not hold, as Wright asserts, that "failing to ask questions *about information that would be considered important* is evidence of pretext" but rather, *failing to ask questions on the topic that served as the basis for the State's explanation of the strike* raises a suggestion that the proffered explanation is pretextual.

Wright's citation to *Alex* is similarly unpersuasive. Wright argues *Alex* supports the similar proposition that a prosecutor's failure to "'engage in any voir dire examination' of the challenged prospective juror" is evidence that the juror's subsequent exclusion was pretext for discrimination. However, Wright's reliance on *Alex* omits important facts. In *Alex*, there were four Black potential jurors in the jury pool. *Alex*, 951 So. 2d at 147. Plaintiff's counsel asked Charlot, one of the Black jurors: "Can you think of any reason that you don't want to serve?" Charlot answered, "None

---

[5]     Miller-El's trial occurred prior to the issuance of the *Batson* opinion but the objection was treated on appeal as a *Batson* challenge.

whatsoever." *Id*. The trial court excused one of the Black jurors for cause, and defense counsel then used peremptory challenges to strike the other three, one of whom was Charlot. *Id*. After counsel for Alex raised a *Batson* challenge, defense counsel explained he struck the juror in question because he did not get "good vibes" from her, thought she did not like him, and that it was "just kind of a gut feeling." *Id.* at 148.

The Supreme Court of Louisiana concluded that while "gut feelings" may factor into the decision to utilize a peremptory challenge, this reason alone does not constitute a race-neutral explanation. *Id.* at 153. Thus, the court held that "the failure of [the defendant] to engage in any voir dire examination of Charlot, *when coupled with its purely intuitive basis for her exclusion*, is further evidence its explanation is a sham and a pretext for discrimination." *Id*. at 154 (emphasis added). Accordingly, *Alex* does not stand for the proposition that a party's failure to ask questions of a potential juror alone constitutes per se discriminatory intent. Here, the State did not rely on intuition for its decision to strike Juror 28, nor did it fail to question Juror 28 so that it could strike her. As such, we do not find *Alex* persuasive as applied to this case.

In this case, we are not persuaded that the State's failure to ask Juror 28 any questions during voir dire is evidence of discriminatory intent when its stated and executed voir dire strategy was to focus questioning on only those rows of potential jurors most statistically likely to serve on the jury--a strategy observed and acknowledged by the district court.

### b. Statistical evidence in the record does not demonstrate discriminatory intent

Wright argues statistical evidence in the record demonstrates discriminatory intent so as to make the district court's finding under the third step of *Batson* clearly erroneous. In support, Wright argues that the United States Supreme Court found statistical evidence persuasive for establishing discriminatory intent in *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (*Cockrell*). However, in context, *Cockrell* is inapplicable to the facts of this case.

Wright relies on *Cockrell* for the proposition that the statistical evidence in this case provides evidence of discriminatory intent because the Court in *Cockrell* found that "in total, 10 of the State's 14 peremptory strikes were used against African-Americans. Happenstance is unlikely to produce this disparity." *Id.* at 342. While true insofar as it goes, this limited quotation does not provide the context of the *Cockrell* opinion. In *Cockrell*, the Court noted that although it was relevant that 91% of the potential Black jurors were struck during the voir dire process, those numbers were not the sole basis for the defendant's *Batson* claim. *Id.* at 331-32. In addition to the

16

statistical evidence, the defendant presented the testimony of judges, current and former assistant district attorneys, and others who had observed firsthand the conduct of the district attorney's office over the years. *Id.* at 334. The defendant also presented evidence of disparate questioning in the voir dire of his trial of potential jurors based on race; a unique state practice called "jury shuffling," which had been used at least twice by the state to remove potential Black jurors from the front of the defendant's jury panel; and extensive pattern and practice evidence of the district attorney's office to systematically exclude Blacks from serving on juries, including the adoption of a formal policy to exclude minorities from jury service. *Id*. at 333-35. Thus, it was in light of all of the evidence, not just the statistical evidence, that the Supreme Court found the defendant had established discriminatory intent. *Id.* at 341.

To the extent *Cockrell* relies on a pattern of striking ten out of fourteen potential Black jurors, no such pattern exists in this case. In fact, Wright does not allege any pattern of discriminatory strikes because the pattern does not exist; there is only a single peremptory challenge at issue in this case. While Wright makes much of the fact that "the State used one of its three peremptory challenges to strike 100% of the Black prospective jurors," there is no factual support for his claim because, as noted above, there is no evidence that Juror 28 is Black. But even if Wright could get past that dispositive fact, generally speaking, striking the only person of color does not necessarily equate to discriminatory intent because "[t]he Supreme Court has never held that 100% exclusion rate is conclusive proof of discriminatory intent and has always used qualified language regarding statistical analysis." *Ish*, 166 Idaho at 504, 461 P.3d at 786. As noted by Justice O'Connor in her concurrence in *Hernandez*:

> An unwavering line of cases from this Court holds that a violation of the Equal Protection Clause requires state action motivated by discriminatory intent; the disproportionate effects of state action are not sufficient to establish such a violation. In *Washington v. Davis*, 426 U.S. 229, 239 (1976), we explained that "our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact."

*Hernandez*, 500 U.S. at 372-73 (Justice O'Connor, with whom Justice Scalia joins, concurring in judgment). Accordingly, we do not find the striking of one juror, who is allegedly Black, provides the statistical evidence to establish the State's proffered reason for the peremptory strike was pretextual.

17

### c.	Disparate questioning does not show discriminatory intent

Wright argues there was disparate questioning because the State "asked questions of most, but not all other potential jurors." First, this limited argument is insufficient for us to conclude that the district court's credibility determination was clearly erroneous. Second, although Wright asserts the State engaged in disparate questioning because the prosecutor did not ask Juror 28 any questions, the prosecutor did not ask any questions of any potential jurors in the back two rows because he did not believe any of them had a statistical likelihood of serving on the jury. Thus, the State treated all potential jurors similarly situated to Juror 28 the same. Accordingly, Wright has not established disparate questioning shows the prosecutor's proffered reason for the strike was pretextual.

### d.	Side-by-side comparisons do not show discriminatory intent

Wright argues side-by-side comparisons, i.e., striking a juror of a protected class for certain responses given in voir dire, but not striking jurors outside the protected class for the same reason, is evidence tending to prove purposeful discrimination. Specifically, Wright argues if the State's strategy was to strike all potential jurors it did not question, then it should have struck Jurors 21 and 30, both of whom were selected to sit on the final jury panel but were not questioned by the State. We are unpersuaded.

First, underlying Wright's side-by-side comparison analysis is the unestablished factual predicate that all other members of the venire, including Jurors 21 and 30, are of a different race than Juror 28. The district court did not make this factual finding, and there is no evidence in the record to support this factual assertion. As previously articulated, appellate courts have repeatedly discussed the importance of a developed appellate record for *Batson* claims, and we have previously held "when a court engages in the comparative juror analysis, it should do so with an inclusive record." *State v. Ornelas*, 159 Idaho 394, 396, 360 P.3d 1075, 1077 (Ct. App. 2015). We do not have a record that provides any evidence about the race of any member of the venire, and we decline to make assumptions about the race, gender, or ethnicity of a prospective juror based on reference to a name, a description of physical appearance, or an unsupported, challenged assertion about a person's physical characteristics, race, gender, or ethnicity. Without an appellate record providing some evidence that Juror 28 is Black and other jury members similarly situated are not Black, we cannot engage in any comparative analysis of the jury to determine the validity

18

of Wright's assertions that the side-by-side comparison of Juror 28 to Juror 21 demonstrates the prosecutor's proffered reason for the strike was pretextual.

Second, Wright's argument as it relates to Juror 30 mischaracterizes the circumstances of Juror 30's selection to sit on the final jury panel. At the time of voir dire, the record demonstrates that Jurors 28 and 30 were treated exactly the same by the State: the prosecutor did not follow up with individualized questioning of either of them. However, after jury selection and Wright's *Batson* challenge, the court excused one of the two alternate jurors selected. The district court told the parties that because the number of people contracting COVID was decreasing, it thought the trial could be completed with just one alternate juror; the State agreed with the district court. However, because Wright wanted two alternates, the district court agreed to select another juror from those who remained in the venire. The district court told the parties the alternate would be selected from Jurors 30-35, and because the parties had already had the opportunity to complete voir dire on these jurors, it would not reopen voir dire prior to the alternate being chosen. The district court stated it would limit any additional voir dire to "any reason for cause that has come up between now and the last time, that may cause someone else to go off the list." Each party was given one peremptory challenge, and unless one of those challenges was directed at Juror 30, Juror 30 would be the final juror chosen for the fourteen-person jury. In that limited context, both the State and Wright declined to voir dire the six prospective jurors, and Juror 30 was chosen to sit on the jury.

Thus, during voir dire, Juror 30 was treated identically to Juror 28, and it was only *after* the initial jury had been selected and *after* Wright's *Batson* challenge that Juror 30 was selected to replace a juror who had been excused. The change in circumstances that led to Juror 30 being selected as the fourteenth juror, despite no additional questioning by the State, does not establish discriminatory intent to strike Juror 28.

### e. Prosecutor's alleged misrepresentations do not show discriminatory intent and does not make the district court's finding that there was not discriminatory intent clearly erroneous

Finally, Wright argues the State's explanation that it struck Juror 28 because it "didn't know anything about her" when it knew about her feelings about the Black Lives Matter movement and "was able to talk to everybody else," when it did not talk to Juror 21, were misrepresentations sufficient to support an inference that its proffered reason for the strike was pretextual. In support of his argument, Wright relies on *Ish*, 166 Idaho at 508, 461 P.3d 790 for the assertion that a

19

"prosecutor's misrepresentation of the record supports an inference that the proffered reason to strike a juror was pretext."

First, *Ish* is inapposite because, while the citation Wright provides is correct insofar as it goes, it does not reflect the context from which it is taken. In *Ish*, the defendant's case received a significant amount of local media attention. *Id.* at 498, 461 P.3d at 780. As a result, although the trial took place in Pocatello, Idaho, the district court ordered the jury pool be selected from Twin Falls, Idaho; the jury would be sequestered in Pocatello and juror names would not be used or released. *Id.*

During voir dire, Juror 3, a person of color, was examined privately as she had indicated some knowledge of the case due to media coverage. *Id.* Based on her responses, Ish challenged Juror 3 for cause. *Id.* The State opposed the challenge, arguing Juror 3 said she was committed to setting aside what she heard in the media and would decide the case based only on the facts. *Id.* at 507, 461 P.3d at 789. The district court denied Ish's motion to strike Juror 3 for cause. *Id.* Thereafter, the prosecutor used a peremptory challenge to strike Juror 3, and Ish raised a *Batson* challenge. The prosecutor's explanation--that he struck Juror 3 because of her exposure to the media--was precisely the opposite stance taken by the prosecutor in response to defense counsel's challenge to Juror 3 for cause. *Id.* Moreover, the prosecutor agreed with the district court's erroneous characterization that it was the State, not Ish, that previously attempted to strike Juror 3 for cause. *Id.* The district court denied the defendant's *Batson* challenge. *Id.*

On appeal, the Idaho Supreme Court held the district court's finding that the strike of Juror 3 was not racially motivated and was clearly erroneous because the decision rested, in part, on the district court's misunderstanding that it was the State, not the defendant, who challenged Juror 3 for cause. *Id.* at 508, 461 P.3d at 790. Nonetheless, the Supreme Court also concluded:

> Here, it is unclear whether the prosecutor misrepresented the record. For instance, the district court's question about the for-cause challenge could have been visually directed at defense counsel and the prosecutor merely affirmed before defense counsel could. Indeed, defense counsel, at no point below, corrected the district court's misapprehension concerning the for-cause challenge despite the opportunity to do so at the *Batson* hearing and after the district court entered its written decision. Likewise, the State's written *Batson* brief merely indicates that Juror 3 was challenged for cause without indicating the source of the challenge. Accordingly, we are unable to infer that the prosecutor misrepresented the record in this case, but we take the ambiguous nature of the record into consideration.

20

*Id.* Thus, *Ish* does not stand for the proposition which Wright asserts nor is it particularly persuasive as applied to the facts of this case.

Second, we decline to characterize the prosecutor's statements in this case as similar to the type of misrepresentation in *Ish* that would lead to a conclusion that the proffered reason for the strike was a pretext for racial discrimination. To say the prosecutor misrepresented the record by stating he "didn't know anything about" Juror 28 when he knew Juror 28's responses to defense counsel's questions about Black Lives Matter, and "was able to talk to everyone else," when he did not ask follow-up questions to Juror 21, does not fairly reflect the record. The context of the prosecutor's explanation indicates that because of his strategic decision to focus on Jurors 1-27 during voir dire, he did not know enough about Juror 28 and felt more comfortable with the jurors he focused attention on during his questioning. While the prosecutor could have been more precise in his language regarding what he "knew" about Juror 28, imprecise language does not equate to a misrepresentation. This Court concludes that the prosecutor's imprecision does not render his statements pretextual, especially when viewed in the context of the record and the State's demonstrated and articulated voir dire strategy. Accordingly, Wright has not established that the alleged prosecutorial misrepresentations show the State's proffered reason for the strike was pretextual.

Ultimately, we are left with two views of the limited record before us. Either the State was genuine in its explanation that it pursued a strategy to focus its limited examination time on the jurors it believed were most likely to serve on the fourteen-member jury to the exclusion of the back two rows of jurors which included Juror 28; or, this explanation was pretextual and the State was motivated to remove Juror 28 because of her alleged race. A district court can measure credibility by, among other factors, "the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Cockrell*, 537 U.S. at 339. When considering the third step of *Batson* challenges, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 369.

The district court took a permissible view of the evidence in crediting the State's explanation, explicitly finding the prosecutor's explanation for his peremptory strike of Juror 28 was credible and not pretextual. The prosecutor offered a verifiable and legitimate explanation for the peremptory challenge of Juror 28; defended the use of peremptory challenges without being

21

asked to do so by the district court; stated he did not know that Juror 28 is Black; and asserted that the race of multiple witnesses for the State, including one of the victims, undermined any motive to exclude Black potential jurors from the final jury. Any of these factors could be taken as evidence of the prosecutor's sincerity and, thus, provide substantial and competent evidence supporting a conclusion that the State did not exercise its peremptory challenge with discriminatory intent. *See Flowers*, ___ U.S. at ___, 139 S. Ct. at 2243-44 (in third step of *Batson*, trial court considers totality of circumstances, including weight of proffered race-neutral explanation in light of all relevant facts, circumstances, and arguments presented, to determine whether peremptory strike was substantially motivated by discriminatory intent).

In sum, the district court determined that the State's use of a peremptory strike to remove Juror 28 was not racially motivated and none of Wright's arguments or cited authority render the court's credibility determination clearly erroneous. Accordingly, the district court did not err in denying Wright's *Batson* challenge after finding there was no discriminatory intent in the State's use of a peremptory strike against Juror 28.

**B.      The District Court Did Not Err in Admitting the Text Message at Issue During Trial, But Even If It Did, Any Error Was Harmless**

During trial, the State admitted Wright's text message to Stuart that stated, in part, that "it had been 7 years and I got carried away." Wright alleges the district court erred in admitting that part of the text message because the language impermissibly implied that he had been incarcerated; therefore, the text message should have been excluded from evidence because it was not relevant and was unduly prejudicial as the jury may have convicted him on this ground. We disagree that the district court erred by allowing the text message to be admitted and, even if it did, any error was harmless.

Although Wright only challenges the "[i]t had been 7 years" phrase in one of the text messages between Stuart and himself, a more contextual overview of the text messages and the procedural history of their admission is helpful. In a pretrial hearing, the State agreed to redact certain portions of the text message exchange at issue.[6] After the redaction, the text messages the State sought to admit read as follows:

---

[6]      At the hearing, the State acknowledged it would need to redact references to probation officers or prison. The district court agreed that these explicit references should be redacted and concluded it did not need to issue a ruling based on the State's concessions. The State sought to

22

| | |
|---|---|
| Stuart-0902 hours: | [A.S.] just told me what's been going on. You need to be out of my house today. Find someplace anyplace to stay. I can't believe I trusted you and this is what you do. |
| Stuart-0902 hours: | I have nothing to say to you. You need to get your stuff and find someplace else to stay. Period. [A.S.'s sister] knows also so she doesn't want you anywhere near her. |
| Wright-0912 hours: | I am genuinely 100% sorry and I totally understand how you feel. I can promise you it will never agin [sic]. |
| Stuart-0912 hours: | You need to explain to cj why you need to leave. I honestly want you gone before we get home. Right now. I can't believe you'd do this. |
| Stuart-0913 hours: | You should have thought about that before you touched my daughter. |
| Wright-0918 hours: | You['re] right patti there's nothing I can say that explain away my actions. It had been 7 years and I got carried away. I didn't have sex with her it's important you know that. I feel like a fool. Truth is this is the last thing I wanted to happen and I'm so sorry. |
| Stuart-0921 hours: | You[r] apology means nothing at this point. Show me you are not that man and leave without me having to call and report this. |
| Wright-0923 hours: | I'm going to leave patti just give me like an hr to figure something out. |
| Stuart-0925 hours: | That's fine you have till 1 pm before we get home. |
| Stuart-1148 hours: | Have you left the house? |
| Stuart-1150 hours: | I cannot not report this. |

The district court issued several rulings about the admissibility of the text messages. In relevant part, the court found the portion of the text message exchange which included the phrase "it had been 7 years," did not need to be redacted because the challenged phrase:

> could be relevant to a materially disputed issue concerning the crime charged other than propensity, because it doesn't reference prison and merely says it had been seven years and I got carried away.
>
> I think it could be viewed as a relevant statement, potentially viewed as some sort of admission regarding his actions by the jury. So I think it is offered for a purpose other than propensity.

However, the district court also made clear that it would not allow the State to introduce evidence that Wright was in prison for seven years or that he was not around females unless Wright opened the door to the evidence.

---

admit the remainder of the text message conversation as evidence of Wright's motive under Idaho Rule of Evidence 404(b).

Prior to the admission of the text message at issue, the jury heard from multiple witnesses that Wright had been absent from the family's lives for the previous seven years. A.S. testified that Wright had been absent from the family's life for the past seven years; A.W. testified that Wright had been absent from her life for the previous seven years; and Stuart testified that Wright had been out of their lives for the past seven years or so. This testimony was admitted without objection from Wright.

During Stuart's testimony, the State sought to admit the text message conversation between Stuart and Wright, including the message that stated "[i]t had been 7 years." Defense counsel objected and noted that while he had not previously objected to the testimony that Wright had been absent from the family for seven years, he nonetheless asked the district court to consider that testimony in the context of a renewed objection to the admission of the text message. The district court overruled Wright's objection, and the text message conversation as detailed above was admitted.

### 1. The district court did not err in admitting the challenged text message

Wright argues the district court erred in admitting the challenged text message. Specifically, Wright alleges the district court erred in conducting its I.R.E. 403 balancing analysis because: (1) the evidence that "it had been 7 years" was irrelevant; and (2) the inference in the text message was that Wright had been in prison for the previous seven years and such inference was so prejudicial that any probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. I.R.E. 401; *State v. Garcia*, 166 Idaho 661, 670, 462 P.3d 1125, 1134 (2020). Whether a fact is of consequence or material is determined by its relationship to the legal theories presented by the parties. *State v. Johnson*, 148 Idaho 664, 671, 227 P.3d 918, 925 (2010). There is no requirement that evidence be relevant only to a disputed issue under I.R.E. 401, only that evidence be probative and material to be admissible. I.R.E. 401; *Garcia*, 166 Idaho at 671, 462 P.3d at 1135. However, even relevant evidence can be excluded if it is unfairly prejudicial. For example, pursuant to I.R.E. 404, evidence of other crimes or wrongs may be relevant, but cannot be admitted for the purpose of showing a defendant's propensity for criminal behavior. Nonetheless, evidence of other crimes or wrongs may be admissible if the prosecution provides

24

notice, and the evidence is relevant to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." I.R.E. 404(b).

A trial court engages in a two-tiered analysis to determine the admissibility of I.R.E. 404(b) evidence. *State v. Fox*, 170 Idaho 846, 861, 517 P.3d 107, 122 (2022). The first tier concerns the relevancy of the evidence at issue. *Id.* The trial court "must determine whether there is sufficient evidence to establish the other crime or wrong as fact" and "whether the evidence of the other act would be relevant to a material and disputed issue concerning the crime charged, other than propensity." *Id.* The first tier is reviewed de novo. *Id.*

The second tier requires the trial court to perform a balancing test pursuant to I.R.E. 403. *Id.* Under this balancing test, the evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Id.* The second tier is reviewed for an abuse of discretion. *Id.* When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine whether the lower court: (1) correctly perceived the issue as one of discretion; (2) acted within the boundaries of such discretion; (3) acted consistently with any legal standards applicable to the specific choices before it; and (4) reached its decision by an exercise of reason. *State v. Herrera*, 164 Idaho 261, 270, 429 P.3d 149, 158 (2018).

Wright concedes the State's offer of proof was sufficient under the first tier of the I.R.E. 404(b) analysis, but alleges the portion of the challenged text message that "it had been 7 years" was not relevant for a non-propensity purpose. In context, the statement that "it had been 7 years and I got carried away," in response to an accusation that Wright inappropriately touched A.S. is probative of Wright's motive or intent for his behavior. Therefore, in the context of the text messages, the statement that "it had been 7 years" meets the threshold for relevance; it has a tendency to make a fact that is of consequence--whether Wright inappropriately touched A.S.-- more likely as it provides some information about why Wright engaged in the inappropriate touching. As such, the "[i]t had been 7 years" portion of the text message was admissible under the first tier of the I.R.E. 404(b) analysis.

We next address whether the probative value of the text message is substantially outweighed by the danger of unfair prejudice. Wright argues the challenged portion of the text message "had little, if any, probative value." The factual underpinning of Wright's prejudice argument is that the only inference (or even the most likely inference) from the phrase "[i]t had

25

been 7 years" is that Wright had been in prison for seven years. Wright offers no other reason to establish the evidence is unfairly prejudicial; thus, without the necessary factual underpinning, Wright's argument fails. There is nothing in the text message conversation that explicates or implies that "it" or the challenged phrase has the meaning Wright assigns it, and this Court declines to engage in multi-level speculation to arrive at the conclusion Wright would have us reach.

Further, prior to the admission of the text message, A.S., A.W., and Stuart each testified, without objection, that Wright had been absent from their lives for seven years. Thus, the relevance of the challenged statement was not substantially outweighed by the minimal, if any, prejudice attached to it. Accordingly, the district court did not err in admitting the challenged portion of the text message.

### 2. The text message was harmless

Even if the district court erred in admitting the "[i]t had been 7 years" portion of the text message, any error was harmless. Error is not reversible unless it is prejudicial. *State v. Stell*, 162 Idaho 827, 830, 405 P.3d 612, 615 (Ct. App. 2017). Where a criminal defendant shows an error based on a contemporaneously objected-to, nonconstitutional violation, the State then has the burden of demonstrating to the appellate court beyond a reasonable doubt the error did not contribute to the jury's verdict. *State v. Montgomery*, 163 Idaho 40, 46, 408 P.3d 38, 44 (2017). Thus, we examine whether the alleged error complained of in the present case was harmless. *See id.* Harmless error is error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record. *Garcia*, 166 Idaho at 674, 462 P.3d at 1138. This standard "requires weighing the probative force of the record as a whole while excluding the erroneous evidence and at the same time comparing it against the probative force of the error." *Id.* If the error's effect is minimal compared to the probative force of the record establishing guilt beyond a reasonable doubt without the error, then the error did not contribute to the verdict rendered and is harmless. *Id.* The reviewing court must take into account what effect the error had, or reasonably may have had, on the jury in the context of the total setting and in relation to all else that happened, which necessarily includes the evidence presented. *Kotteakos v. United States*, 328 U.S. 750, 764 (1946).

We first consider the probative force of Wright's challenged statement. As previously discussed, the statement "[i]t had been 7 years" does not imply that Wright had been incarcerated for the past seven years. Further, the jury repeatedly heard, without objection, from A.S., A.W.,

26

and Stuart that Wright had been absent from the family for the previous seven years. Thus, any additional evidence provided by the text message stating that "it had been 7 years," was merely cumulative evidence that Wright had been absent for seven years and therefore has little, if any, probative force.

Additionally, the district court specifically instructed the jury not to consider where Wright may have been during his absence from the family and to avoid speculating about the reason for Wright's absence. We presume that the jury followed the district court's instructions, *see State v. Kilby*, 130 Idaho 747, 751, 947 P.2d 420, 424 (Ct. App. 1997); *State v. Hudson*, 129 Idaho 478, 481, 927 P.2d 451, 454 (Ct. App. 1996), and Wright does not point to any evidence in the record to indicate the jury disregarded this instruction. Consequently, we cannot say that the admitted text message had any effect on the jury in relation to the other evidence presented. The jury heard that Wright was absent for seven years and presumably did not speculate where Wright may have been. Thus, any error in admitting the challenged portion of the text message was harmless.

## C. The District Court Did Not Err by Denying Wright's Motion for a Mistrial

Wright alleges the district court erred in denying his motion for a mistrial because the State's failure to redact A.S.'s statement that it had been "[s]even years since [Wright] had slept with a girl" from the video of her CARES interview violated the district court's previous ruling and implied that Wright had recently been incarcerated for seven years. Wright alleges this failure resulted in prejudicial evidence being presented to the jury and constituted reversible error.

The parties agree the district court's pretrial order arising from the challenge to the text messages applied to all other evidence the State admitted during trial. Accordingly, the State redacted the statements from the video of A.S.'s CARES interview that it believed would violate the district court's pretrial order and provided a redacted copy of the interview to Wright. After reviewing the video, Wright's counsel asked the State to make additional redactions; the State agreed to make some of the redactions; and the remainder of the challenges were resolved by the district court. Each time the State redacted the video, a copy of the newly redacted video was provided to Wright's counsel. However, the copy of the video exhibit of A.S.'s CARES interview which the State admitted and published to the jury included a statement by A.S. that it had been "[s]even years since [Wright] had slept with a girl." The statement came in the middle of a video that was more than an hour long, where A.S. described multiple instances of alleged abuse with a high level of detail. After detailing one allegation, A.S. recalled:

27

A.S.:  [Wright] said he was sorry and that I had to understand that it had been seven years. Umm . . . .

Interviewer:  You talked about how he said that you would have to forgive him and that it had been seven years. What was he talking about?

A.S.:  Seven years since he had slept with a girl.

After the video was played for the jury, Wright's counsel objected to an "additional" hearsay statement in the video. The State responded that it had "done [its] best" to redact the video and had given each iteration of the redacted video to Wright's trial counsel so that if "things slipped through," defense counsel would catch it. The State noted that Wright's counsel did not bring to the State's attention that the most recently redacted copy of the video contained the challenged statement by A.S. The district court overruled the objection.

Wright then made a motion for a mistrial on the grounds that:

the State has routinely mentioned with witness after witness and then twice in that video [Wright] being away for seven years. I believe they also brought it up in their opening. They have been very deliberate to say he was away for seven years, he was gone for seven years. In the CARES's video, [A.S.] says twice, he was gone for seven years and he wasn't able to have sex with a girl for seven years.

After the video of A.S.'s CARES interview had been published to the jury, the district court ordered the State to redact the statement at issue from the CARES video before it went back with the jury for deliberations. Wright requested the district court to not instruct the jury that a portion of the CARES video had been redacted, but the court declined to adopt Wright's suggestion and instead informed the jury that "the Court took up a legal matter over the lunch recess, and the Court has redacted a limited portion of the video that was played to you previously." Wright argues that the State's repeated mention of Wright's absence for seven years throughout the trial was not accidental and that the repeated reference combined with the additional context that it had been "seven years since he has been with [a] girl or hasn't been with a girl for seven years" indicated there was only one conclusion the State wanted the jury to draw--that Wright had been incarcerated--and that inference was "incredibly prejudicial." The State explained that it explicitly referenced the "seven years" in questions to various witnesses so the witnesses would not be able to expound on the answer and to keep the witnesses from providing any answer that would exceed the district court's order precluding any explanation of why Wright was previously absent from the family for seven years.

The district court asked Wright's counsel if the references to seven years in the video had been on the redacted copy that was provided to defense counsel, and counsel responded, "I don't

28

recall. I don't have a reason to believe not. But frankly, we've been going back and forth on redactions the whole time and I don't recall." The State responded that the challenged statements had been on every redacted version of the video given to Wright's counsel. The State further indicated that in the days before the trial started, it reviewed the audio of the hearing wherein the district court described the information to be redacted from the text messages to ensure it redacted similar information from the CARES videos. The State understood the district court's prior ruling to preclude any reference to Wright's incarceration and that he had not been around women, but that it could include references to Wright's absence for seven years, and thought it had redacted the video accordingly. Wright's attorney responded that while the parties had "gone back and forth" on the redactions, it was not the defense's burden to ensure the State complied with the district court's order regarding redaction. The defense had "tried [its] best" (to review the video), but it was "on the State" to follow court orders, not the defense.

In criminal cases, motions for mistrial are governed by Idaho Criminal Rule 29.1. A mistrial may be declared upon motion of the defendant when there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, which is prejudicial to the defendant and deprives the defendant of a fair trial. I.C.R. 29.1(a). Our standard for reviewing a district court's denial of a motion for mistrial is well established:

> [T]he question on appeal is not whether the trial judge reasonably exercised his discretion in light of circumstances existing when the mistrial motion was made. Rather, the question must be whether the event which precipitated the motion for mistrial represented reversible error when viewed in the context of the full record. Thus, where a motion for mistrial has been denied in a criminal case, the "abuse of discretion" standard is a misnomer. The standard, more accurately stated, is one of reversible error. Our focus is upon the continuing impact on the trial of the incident that triggered the mistrial motion. The trial judge's refusal to declare a mistrial will be disturbed only if that incident, viewed retrospectively, constituted reversible error.

*State v. Urquhart*, 105 Idaho 92, 95, 665 P.2d 1102, 1105 (Ct. App. 1983). Error is not reversible unless it is prejudicial. *Stell*, 162 Idaho at 830, 405 P.3d at 615. The Idaho Supreme Court clarified the harmless error standard for an objected-to, nonconstitutionally-based error in *Garcia*. This standard requires weighing the probative force of the record as a whole while excluding the erroneous evidence and at the same time comparing it against the probative force of the error. *Garcia*, 166 Idaho at 674, 462 P.3d at 1138. The reviewing court must take into account what effect the error had or reasonably may have had on the jury in the context of the total setting

29

and in relation to all else that happened, which necessarily includes the evidence presented. *Kotteakos*, 328 U.S. at 764. If the error is harmless, it cannot be reversible error because it has minimal continuing impact on the trial.

The threshold inquiry on appeal in evaluating the denial of a motion for a mistrial is whether the State introduced error. *State v. Richardson*, 168 Idaho 25, 30, 478 P.3d 754, 759 (Ct. App. 2020). In this case, the State introduced the error by failing to redact the relevant portion of the video.

We next consider the probative force of the admission of A.S.'s statement in the CARES interview that it "had been seven years since [Wright] slept with a girl." It is well established that the admission of improper evidence does not automatically require a mistrial, *State v. Grantham*, 146 Idaho 490, 498, 198 P.3d 128, 136 (Ct. App. 2008); *State v. Hill*, 140 Idaho 625, 631, 97 P.3d 1014, 1020 (Ct. App. 2004), and a trial court's curative instruction is a factor to consider when determining the probative force of the error. *Richardson*, 168 Idaho at 31, 478 P.3d at 760. Thus, where improper evidence is introduced into a trial and the trial court promptly instructs the jury to disregard such evidence, we presume that the jury followed the court's instructions. *See Kilby*, 130 Idaho at 751, 947 P.2d at 424; *Hudson*, 129 Idaho at 481, 927 P.2d at 454. We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the trial court's instructions and a strong likelihood that the evidence would have a devastating effect to the defendant. *Grantham*, 146 Idaho at 498, 198 P.3d at 136.

The district court instructed the jury that, "[t]hroughout the trial, you have heard evidence the defendant was not around his family for a period of time. You are not to speculate as to why this occurred." Wright acknowledges the district court gave a limiting instruction, but argues both that the admission of the statement at issue was "so prejudicial that there was no practical way to cure the error," and, even if the error could be cured, the court's modification of the exhibit and limiting instruction were insufficient. We disagree.[7]

---

[7] We note that Wright argues the redaction was insufficient to cure the error because "[t]he jury was not told what was redacted, at the request of defense counsel, or that they could no longer consider the portion that had been redacted." Additionally, Wright alleges the limiting instruction was insufficient because it only told the jury not to consider why Wright had not been around his family, not why he had not had sex, thus, it "failed to fully limit the consideration of the improper evidence." However, Wright invited both alleged errors.

Wright fails to establish that this Court should set aside the presumption that the jury followed the district court's instruction. Wright does not point to evidence in the record establishing an overwhelming probability that the jury was unable to follow the district court's instruction and that there was a strong likelihood the statements had a devastating effect on Wright's defense. The statement at issue does not relate to an admission that Wright had previously been incarcerated, but instead that he had not "slept with a girl" in seven years. Despite Wright's argument to the contrary, that statement does not give rise to the implication that Wright had been incarcerated. We cannot conclude there was an overwhelming probability that the jury was unable to follow the district court's instruction and that there was a strong likelihood the statements had a devastating effect on Wright's defense.

Even if the jury thought the statement implied that Wright been incarcerated during that time, the district court's limiting instruction specifically told the jury not to "speculate as to why" Wright was absent during this time. The jury was instructed to ignore and, thus, not consider in its deliberations why Wright was away from the family, and there is nothing in the record that indicates the jury was unable to do so. Moreover, any effect the alleged implication may have had on the jury was further minimized in light of A.S.'s testimony.

A.S. testified, without objection, that during the month of May 2019, Wright touched her in a sexual way. Among other allegations, she described that, throughout the month of May 2019, Wright would "grab me by my waist. He would grab my boobs. He would, I guess you would say, finger me above the clothes." A.S. testified that this occurred "basically just any time where

First, after deciding that it would redact the statement at issue from the CARES video, the district court specifically inquired whether Wright would "want the jury instructed that a portion of [the CARES] video has been stricken," and Wright's counsel responded that they did not. Second, when the district court asked Wright about its proposed limiting instruction of "[t]hroughout the trial, you've heard evidence the defendant was not around his family for a period of time. You are not to speculate as to why this occurred, nor are you to consider that fact in your deliberation," Wright's counsel responded that it did not want any limiting instruction to be given but, if the court decided to give one, they "would ask you to give it as it is." Thus, Wright's counsel never asked for the district court to alter the jury instruction to reflect any of the language Wright now alleges should have been included and has invited the error about which he now complains. *See State v. Richardson*, 168 Idaho 25, 31-32, 478 P.3d 754, 760-61 (Ct. App. 2020) (holding despite his previous objections to giving curative instruction as unhelpful, because defendant ultimately agreed to curative instruction given, he invited any claim of error related to instruction).

31

it was just me and him." This mirrored A.S.'s description of Wright's behavior that A.S. gave during her CARES interview:

Interviewer: When were the other times that he has touched your vagina?
A.S.: It was everyday with that.
Interviewer: Everyday with what?
A.S.: Just the physically grabbing stuff.
Interviewer: Ok.
A.S.: I guess you could say fingering, but it was never underneath my clothes.

A.S. further disclosed during the CARES interview that her depression and anxiety became worse after May 2019 and that she contemplated suicide. Stuart testified that although she did not witness any of the behavior which A.S. testified about, she did notice changes in A.S.'s behavior throughout the month in which Wright lived with them. She explained that prior to Wright moving in and throughout early May, A.S. was outgoing and spent much of her time around the family. However, toward the end of May things changed; A.S. became withdrawn, spent a lot of time in bed, and started to wear big shirts and sweatshirts. Stuart further testified that while A.S. was mostly an "A student" who took advanced placement classes, after May 2019, her grades declined. Stuart explained that A.S. no longer took advanced placement classes and her grades included four Ds, one C, and one B. Similarly, one of A.S.'s sister's testified that in May 2019, A.S. didn't interact with other family members as much as she used to and she spent more time with her other sister, A.W. Shannon Sorini, an expert in the area of child sexual abuse, testified that it is very common for people around a child who is being sexually abused to not notice the abuse. Sorini testified that although children's coping responses to sexual abuse may vary, children may exhibit depression, anxiety, suicidal thoughts, and changes in their academic performance as a result of the abuse.

Finally, although Wright testified and denied ever sexually abusing A.S., the text messages that were admitted demonstrated that when Wright was confronted with A.S.'s allegations, Wright appeared to acknowledge and accept responsibility for the touching, responding: "You['re] right patti there's nothing I can say that explain away my actions."[8]

---

[8] Wright argued at trial that the context of the text messages was not that he was acknowledging he inappropriately touched A.S. Instead, Wright argued that A.S. was the sexual aggressor, claiming she was rubbing against him and behaving in a sexually explicit way towards him, and it was Wright's failure to address A.S.'s inappropriate behavior that he told Stuart would never happen again.

This Court is satisfied that any effect the statement in the CARES interview had, or reasonably may have had, on the jury in relation to all of the evidence presented was minimal and did not contribute to the jury's verdict. Thus, the district court did not err in denying Wright's motion for a mistrial.

**D.  Wright Did Not Establish a Claim of Prosecutorial Misconduct**

Wright alleges the State's failure to properly redact A.S.'s statement in her CARES interview in accordance with the district court's pretrial ruling amounted to prosecutorial misconduct. In response, the State alleges this argument is unpreserved because Wright did not assert a claim of prosecutorial misconduct below. The State cites to *State v. Neimeyer*, 169 Idaho 9, 13, 490 P.3d 9, 13 (2021) for the proposition that a reviewing court "will not hold that a trial court erred in making a decision on an issue . . . that it did not have the opportunity to address." *Id*. (quoting *State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2019)). Rather, in most instances, a party must raise an issue before the trial court in order to preserve the issue for appeal. *Id.* Alternatively, the State argues the claim is unsupported by the record.

Although our system of criminal justice is adversarial in nature, and the prosecutor is expected to be diligent and leave no stone unturned, the prosecutor is nevertheless expected and required to be fair. *State v. Field*, 144 Idaho 559, 571, 165 P.3d 273, 285 (2007). However, in reviewing allegations of prosecutorial misconduct we must keep in mind the realities of trial. *Id.* A fair trial is not necessarily a perfect trial. *Id.* The Idaho Supreme Court has recently reiterated the standard for analyzing a claim of prosecutorial misconduct:

> The first step in a prosecutorial misconduct analysis "is to determine whether the alleged conduct actually rises to the level of prosecutorial misconduct." This Court has said, "[p]rosecutorial misconduct occurs when the State 'attempts to secure a verdict on any factor other than the law as set forth in the jury instructions and the evidence admitted at trial, including reasonable inferences that may be drawn from that evidence.'" "[T]he prosecutor has a duty to avoid misrepresentation of the facts and unnecessarily inflammatory tactics."

*State v. Miller*, 165 Idaho 115, 122, 443 P.3d 129, 136 (2019) (citations omitted). When there has been a contemporaneous objection, we determine factually if there was prosecutorial misconduct and then determine whether the error was harmless. *Id.*; *State v. Phillips*, 144 Idaho 82, 88, 156 P.3d 583, 589 (Ct. App. 2007). A conviction will not be set aside for small errors or defects that have little, if any, likelihood of having changed the results of the trial. *State v. Baker*, 161 Idaho 289, 299, 385 P.3d 467, 477 (Ct. App. 2016).

33

Regardless of whether the issue is preserved, this Court declines to find any prosecutorial misconduct in this case. As noted above, the State reviewed the district court's order and believed it had redacted the CARES video consistently with that order; nothing in the record indicates the State intentionally disregarded the district court's order or that in failing to make the redaction it was trying to unfairly obtain a conviction. After each redaction, the State provided a copy of the newly redacted video to defense counsel. Defense counsel acknowledged that the parties had "gone back and forth" on the redactions, the defense counsel had a copy of the redacted video containing the statement, and the redacted video had been provided prior to trial. The district court found both sides had an opportunity to bring the issue to the court's attention prior to the video being played because counsel for both sides had either actually reviewed or had the opportunity to review the redacted video. In this context, it appears that the failure to redact the statement was an oversight by the State, not an attempt to obtain a conviction on an improper ground or engage in inflammatory tactics. Thus, we decline to find the State engaged in misconduct.

Additionally, the admission of A.S.'s statement in her forensic CARES interview was harmless as we presume the jury followed the district court's instructions and the admission of the statement did not have such probative force when weighed against the evidence in the case, excluding the statements, as to have a continuing effect on the trial. Accordingly, any alleged error was harmless and, as such, is not grounds for vacating Wright's conviction based on alleged prosecutorial misconduct.

**E.     The District Court Did Not Err in Denying Wright's I.R.E. 412 Motion**

Wright alleges the district court erred by denying his I.R.E. 412 motion to present evidence that "A.S. had a history of making false allegations of sexual abuse." Wright argues the district court erred when it denied his motion to allow him to cross-examine A.S. about these prior allegations under both I.R.E. 412(b)(3) and (b)(5). Specifically, Wright asserts that the district court used an incorrect legal rubric to determine whether A.S.'s prior claims were false and in weighing the probative value against the prejudicial effect of the evidence. Wright also argues A.S.'s claims of prior sexual abuse are admissible under I.R.E. 412(b)(3) because her prior allegations were false and under I.R.E. 412(b)(5) because failing to allow Wright to impeach and cross-examine A.S. about the prior false allegations would deprive him of his Sixth Amendment right to confront and cross-examine the witnesses against him.

34

Generally, evidence of a sex crime victim's past sexual behavior is not admissible in a criminal case. I.R.E. 412(a),(b); *State v. Chambers*, 166 Idaho 837, 841, 465 P.3d 1076, 1080 (2020). These laws aim both to safeguard the alleged victim against the invasion of privacy, potential embarrassment, and sexual stereotyping that is associated with public disclosure of the victim's prior sexual behavior and to encourage victims of sexual misconduct to institute and to participate in legal proceedings against alleged offenders. *Id.*; *see also* Fed. R. Evid. 412 advisory committee's note to 1994 amendment. However, I.R.E. 412(b)(1)-(5) also provides a defendant in a criminal case the ability to introduce evidence that would otherwise be barred by the rule when that evidence is potentially relevant to the charged offense. The purpose of providing the exceptions contained in I.R.E. 412 "is to protect the defendant's right to a fair trial, while protecting the victim from public embarrassment from the disclosure of past sexual behavior." *Chambers*, 166 Idaho at 843, 465 P.3d at 1082. Among the circumstances in which specific instances of the victim's past sexual behavior may be admitted under I.R.E. 412(b) are:

> (3) an alleged victim's prior false allegations of sex crimes made at an earlier time; or
> . . . .
> (5) evidence whose exclusion would violate the defendant's constitutional rights.

A defendant who intends to introduce evidence falling within one of the exceptions recognized in I.R.E. 412(b) must make a written motion to offer such evidence, describing the evidence and stating the purpose for which it is to be offered, generally no later than five days before the date on which the trial is scheduled to begin. I.R.E. 412(c)(1)(A),(B). Before admitting evidence under this rule, the trial court must conduct an in-camera hearing at which the parties may call witnesses, including the alleged victim, and offer other relevant evidence. I.R.E. 412(c)(2). "[I]f the relevance of the evidence which the defendant seeks to offer depends upon the fulfillment of a condition of fact, the court . . . must accept evidence on the issue of whether such condition of fact is fulfilled and determine the issue." *Id.* Ultimately, if the trial court determines "the evidence that the defendant intends to offer is relevant and that the probative value of such evidence outweighs the danger of unfair prejudice, the evidence must be admitted." I.R.E. 412(c)(3).

Prior to trial, Wright filed a motion pursuant to I.R.E. 412(b)(3) and (b)(5) to allow the introduction of evidence that A.S. made prior false allegations of sex crimes. As evidence of his claim, Wright filed the police reports from Arizona as an addendum to his motion. Wright asserted

35

that in Arizona in 2015, A.S. alleged that a family friend sexually abused her by manual to genital contact and, while the Arizona police "conducted a full investigation," the accused was never arrested or prosecuted based on these allegations. Wright argued:

> While the reports do not indicate the specific thought process or reasoning of law enforcement and the Arizona prosecuting agency that handled this case, it can be reasonably extrapolated that after conducting its investigation law enforcement could not establish probable cause that this crime actually occurred and that [the accused] committed it.

Wright asserted that he had shown by a preponderance of the evidence that A.S. had made previous, false allegations of sex crimes under I.R.E. 412; he should be permitted to cross-examine A.S. about this issue because it was relevant to her credibility; and the probative value of the evidence significantly outweighed the risk of unfair prejudice.

The State opposed the motion, arguing there was no evidence that A.S.'s 2015 allegations were false and allowing the introduction of the 2015 allegations at trial would be irrelevant and unduly prejudicial. The district court held a hearing on the motion at which the parties offered oral argument. Wright offered no additional evidence, relying solely on the police reports contained in his addendum to support his claim.

The district court issued an oral decision. First, the district court explained that it considered Wright's addendum, transcripts, and summaries of witness interviews regarding A.S.'s 2015 allegations of abuse and noted that whether to allow evidence of prior false accusations of sex crimes was a discretionary decision. Second, the district court found the evidence was not admissible pursuant to I.R.E. 412(b)(5) because its exclusion would not violate Wright's constitutional rights. The district court recognized that Wright has a constitutional right to confront witnesses and could certainly attack A.S.'s credibility "based on the facts that occurred in this case," but it would be unfair to use "allegations that are not proven to be false of a victim's sexual history or allegations of sexual crimes as evidence that she is not telling the truth in the current trial."

The district court continued that even if the evidence was admissible under I.R.E. 412(b)(5), it would not allow the evidence to be admitted because allegations from another state that have not been proven false had no relevance in the trial. The district court also held that the probative value of the evidence was substantially outweighed by the danger of undue prejudice, allowed extraneous issues to come before the jury, wasted time, and created a second trial within a trial on collateral issues that would be unhelpful to the issue before the jury. Accordingly, the

36

district court found Wright had not established that evidence of A.S.'s 2015 allegations should be admitted pursuant to I.R.E. 412(b)(3) or (b)(5) and, accordingly, denied Wright's motion.

Subsequently, Wright filed a motion requesting the district court reconsider its denial of the I.R.E. 412 motion, "specifically in reference to subsection [412](b)(5)." Wright argued he "cannot defend himself without being able to fully explore A.S.'s credibility as a witness, which inherently includes her history of making sexual abuse allegations" and, therefore, the court should reconsider its analysis pursuant to I.R.E. 401 and 403. The district court reiterated that it previously "made several findings regarding how there is no evidence that A.S. was untruthful in the Arizona proceedings"; without evidence of falsity, the 2015 allegations were not relevant; and the probative value was outweighed by unfair prejudice, confusion, and misleading the jury. Accordingly, the district court held that while Wright could question A.S. about her credibility regarding the events in the current case, evidence of the 2015 allegations would be excluded, and the court denied Wright's motion for reconsideration.

### 1. The district court did not err in finding evidence of A.S.'s 2015 allegations was not permitted pursuant to I.R.E. 412(b)(3)

Wright argues the district court erred when it used an incorrect test to deny his I.R.E. 412 motion under I.R.E. 412(b)(3). Wright claims the district court required evidence that A.S. recanted her previous statement in order to find the prior allegations are false instead of applying the correct test, which is whether the allegations were proven to be false by a preponderance of the evidence. Wright also argued the district court incorrectly applied the I.R.E. 403 balancing test in weighing the probative value and prejudicial effect of such evidence instead of the I.R.E. 412 balancing test.[9]

The Idaho Supreme Court has adopted a three-part test to determine the admissibility of an alleged victim's prior false allegations of sex crimes under I.R.E. 412. *Chambers*, 166 Idaho at 845, 465 P.3d at 1084. The first step of the analysis requires the trial court to determine whether

---

[9]     The State argues, in part, that because the district court denied Wright's motion using I.R.E. 412 and I.R.E. 401 and 403, but Wright only challenges the district court's holding under I.R.E. 412, we must affirm on the uncontested basis. Because Wright alleges the district court erred both in its application of I.R.E. 412 and its use of I.R.E. 403, Wright challenges both bases on which the court made its decision, and this Court will address Wright's contentions on the merits. We also note that, although Wright argues on appeal that the I.R.E. 403 balancing test does not apply to evidence admitted pursuant to I.R.E. 412, Wright requested the district court apply an I.R.E. 403 analysis to the evidence.

the defendant established, by a preponderance of the evidence, that the prior allegation is false. *Id.* If the defendant meets this threshold of establishing falsity, the trial court must determine whether the evidence is relevant. *Id.* at 846, 465 P.3d at 1085. Generally under this second step, evidence of prior false allegations will be highly probative. *Id.* Finally, under the third step, the trial court must balance the probative value of the evidence with the danger of undue prejudice pursuant to I.R.E. 412(c)(2); if the court determines that "the probative value of such evidence outweighs the danger of unfair prejudice," the evidence is admissible. *Chambers*, 166 Idaho at 846, 465 P.3d at 1085. A trial court's evidentiary ruling is reviewed for an abuse of discretion. *Id.* at 840, 465 P.3d at 1079.

The district court did not err in finding that Wright did not meet his burden of showing that A.S.'s 2015 allegations were false. We disagree with Wright's assertion that the district court "failed to apply a preponderance of evidence standard when determining whether the prior allegation was false, finding instead that the test was whether the alleged victim had recanted." During the I.R.E. 412 motion hearing, the district court specifically asked Wright how the evidence he presented showed that the allegations were false by a preponderance of the evidence, stating:

> I understand the police reports, and I have reviewed those have been filed. . . .
> But I don't see how I can--something written down by a police officer, I don't see how the Court can put any weight on those documents for knowing whether they support or don't support that the allegations were true or false. A finding of no probable cause is not a finding that the victim has lied or the perpetrator has lied. It was never contested. It was never tried. No determination was made. There was a decision not to charge the person.
> *But that--how does that, by a preponderance of the evidence, show to the Court that these were false allegations*?

(Emphasis added.) The district court never articulated a different burden of proof, either at the hearing or during its subsequent oral decision denying the I.R.E. 412 motion. After articulating the correct standard at the I.R.E. 412 hearing, the district court later issued its decision, concluding that based on the evidence presented, namely "the addendum that was filed by the defendant that included the police reports and transcripts or summaries of certain interviews of witnesses regarding the 2015 allegations made by A.S. against a person identified and referred to as her godfather," "have not been proven to be false," and "[t]he evidence proffered does not establish a false allegation."

The district court detailed the evidence before it and explained how Wright failed to establish falsity because: (1) nothing in the reports indicated the police did not believe A.S.;

(2) while the reports stated the accused denied he committed the alleged conduct, the reports also stated that he declined to take a polygraph test; and (3) the fact that Arizona ultimately did not pursue criminal charges as a result of A.S.'s 2015 allegations does not support the inference that the allegations were false. The district court also found that no other evidence before it established that A.S.'s 2015 allegations were false because A.S.: (1) was consistent with her description of the 2015 allegations in interviews; (2) did not try to hide the existence of the 2015 allegations from law enforcement in the current case and actually brought the allegations to their attention; (3) did not demonstrate a pattern of untruthful behavior elsewhere in evidence; and (4) never recanted the 2015 allegations.

Contrary to Wright's assertion on appeal that "the district court found that the standard for determining if a prior allegation is false was whether or not an accuser had recanted the allegation," the court did not require proof of recantation as the only way to establish that a previous allegation is false. Instead, as listed above, the district court assessed the evidence Wright presented and found there was *no* evidence, let alone a preponderance of the evidence, that A.S.'s 2015 allegations were false. The district court did not find that Wright did not meet his burden in establishing that A.S.'s 2015 allegations were false only because A.S. never recanted the allegations. In fact, the court outlined multiple reasons why the evidence Wright provided to support his motion failed to show the 2015 allegations were false.

While Wright maintains that "the district court has not evaluated" whether the evidence he provided showed that A.S.'s 2015 allegations were false by a preponderance of the evidence, he also asserts "that the evidence proves the prior allegation was false." We disagree. The police reports filed by Wright indicate that in 2015, a police officer in Arizona responded to a report of molestation of a child, presumably A.S. According to the reports, A.S. reported that a family friend had engaged in manual-to-genital contact with her over a period of time, ending in late 2014. Approximately a week later, Stuart took A.S. to a hospital for a sexual assault evaluation; a different police officer responded and informed Stuart that a sexual assault evaluation would not be performed because of the extended time since the last alleged abuse. Stuart asked the officer why the accused had not been arrested, and the officer responded that they needed to establish probable cause, which they were seeking through a forensic interview of A.S. and anyone else relevant to the investigation.

Wright relies on the "lack of probable cause" statement but fails to note that the statement by police came approximately one week after A.S. made her initial disclosure and before any forensic interviews of A.S. A statement made by law enforcement early in an investigation provides no information about the falsity of the underlying allegation, and does not establish, by a preponderance of the evidence, that A.S.'s allegations were false. Similarly, although Wright's counsel asserts no charges were filed, statements by counsel are not evidence. *See Zepeda*, 152 Idaho at 716, 274 P.3d at 17 (noting unsworn oral or written representations, even those of officer of court, are not evidence). Even if no charges were filed, the lack of formal charges provides no information regarding the falsity of A.S.'s statements. In sum, nothing in the record suggests the lack of prosecution was because A.S. made false allegations.

Wright also argues the district court erred in finding there was no evidence of falsity because the police reports contained information that the accused individual denied the charges. The third party's denial is not evidence of the falsity of A.S.'s statements, it is only evidence of the *fact* of the denial, not the *truth* of the denial. Accordingly, Wright has failed to establish by a preponderance of the evidence that A.S.'s 2015 allegations were false, and the district court did not err in finding Wright failed to establish the first prong of the I.R.E. 412(b)(3) analysis. Consequently, we do not need to make a determination of whether the court erred in its analysis of the second and third prongs of the I.R.E. 412 test.

### 2. The district court did not err in finding evidence of A.S.'s 2015 allegations was not permitted pursuant to I.R.E. 412(b)(5)

Wright alleges the district court erred in denying his I.R.E. 412 motion because evidence that A.S.'s 2015 allegations were false is permissible under I.R.E. 412(b)(5) as its exclusion would violate his constitutional rights. Wright admits that I.R.E. 412(b)(3) and (b)(5) are "invariably intertwined" such that "whether or not A.S. had made a false allegation in the past is critical to evaluating admissibility" under both subsections. Wright's argument concerning the admissibility of evidence of A.S.'s 2015 allegations hinges on whether Wright met his burden of establishing that they were false. *See*, *e.g.*, *State v. Clark*, 219 P.3d 631, 638 (Utah Ct. App. 2009) (holding defendant must establish falsity of allegation by preponderance of evidence before any constitutional rights are triggered). As Wright did not establish that A.S.'s 2015 allegations were false by a preponderance of the evidence, we need not address this claim further.

40

**F.      There Is No Cumulative Error**

Wright also contends that the cumulative error doctrine applies here, necessitating a reversal of his conviction. Under the doctrine of cumulative error, a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial. *State v. Adamcik*, 152 Idaho 445, 483, 272 P.3d 417, 455 (2012). However, a necessary predicate to the application of the doctrine is a finding of more than one error. *Id*. Wright has failed to demonstrate at least two errors, a necessary predicate to the application of the cumulative error doctrine. As such, Wright is not entitled to relief under the cumulative error doctrine.

## III.

## CONCLUSION

The district court did not err in denying Wright's *Batson* challenge, his I.R.E. 412 motion, or his motion for a mistrial. The district court did not err in admitting the text message, but even if the admission of the text message was error, such error was harmless. Wright has not established prosecutorial misconduct. Finally, there is no cumulative error. Accordingly, the district court did not err and the judgment of conviction is affirmed.

Chief Judge LORELLO and Judge BRAILSFORD **CONCUR**.